UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| | |
|---|---|
| KIM LOGAN, as Legal Guardian for JAMES O. GUMM, JR., )<br>)<br>Plaintiff, )<br>)<br>and )<br>)<br>KENTUCKY CABINET FOR HEALTH & FAMILY SERVICES, )<br>)<br>Intervening Plaintiff, )<br>)<br>and )<br>)<br>UNIVERSITY OF KENTUCKY & KENTUCKY MEDICAL SERVICES FOUNDATION, )<br>)<br>Intervening Plaintiffs, )<br>)<br>v. )<br>)<br>COOPER TIRE & RUBBER COMPANY, )<br>)<br>Defendant. ) | No. 5:10-CV-03-KSF<br><br>ORDER |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

The Court addresses Cooper Tire's motion to exclude testimony from Troy Cottles, a liability expert for Plaintiff, under Federal Rule of Evidence 702. To resolve the motion, the Court has considered the full briefing, to include all attachments. *See* DE #187 (Sealed Motion to Exclude); DE #229 (Sealed Response); DE #234 (Notice of Filing); DE #236 (Sealed Reply). The assessment also included the full 300+ page Cottles deposition and the full Cottles expert report. Because Plaintiff has proven admissibility under Rule 702 by the appropriate standards,

1

the Court **DENIES** the motion of Cooper Tire except as expressly stated.

**I. Standard of Review**

Rule 702 governs expert proof. A proposed expert's opinion testimony is admissible if the party proffering the testimony meets three requirements, as identified in the Rule's reflection of the Supreme Court's holdings in *Daubert v. Merrell Dow Pharmaceuticals*, 113 S. Ct. 2786 (1993) and *Kumho Tire Co. v. Carmichael*, 119 S. Ct. 1167 (1999). First, the witness must be qualified as an expert by knowledge, skill, experience, training, or education. Fed. R. Evid. 702; *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529 (6th Cir. 2008). Second, the testimony must be reliable. *Id.* Finally, as with all evidence, the proposed expert testimony must be relevant in that it will assist the trier of fact to understand the evidence or to determine a fact in issue. *Id. See* Fed. R. Evid. 402. The party proffering expert testimony bears the burden of showing "by a 'preponderance of proof' that the expert whose testimony is being offered is qualified and will testify to scientific [or other specialized] knowledge that will assist the trier of fact in understanding and disposing of issues relevant to the case." *Pride v. BIC Corp.*, 218 F.3d 566, 578 (6th Cir. 2000) (quoting *Daubert*, 113 S. Ct. at 2796 n.10); Fed. R. Evid 104(a) (basis for making a preliminary finding). A preponderance suggests a "superiority in weight" of the evidence before a court. *See Black's Law Dictionary* 1220 (8th ed. 2004); *id.* (defining "preponderance of the evidence" as "the greater weight of the evidence").

A. Qualifications as an Expert

As noted, a proposed expert under Rule 702 must qualify by reference to "knowledge, skill, experience, training, or education." *See* Fed. R. Evid. 702. Such witnesses must do more than simply claim qualification. *See Rose v. Truck Centers, Inc.*, 388 F. App'x 528, 533 (6th Cir.

2010) (citing *Pride,* 218 F.3d at 577). The qualifications, with some objective validation, must be appropriate for either scientific and non-scientific expert testimony:

> The distinction between scientific and non-scientific expert testimony is a critical one. By way of illustration, if one wanted to explain to a jury how a bumblebee is able to fly, an aeronautical engineer might be a helpful witness. Since flight principles have some universality, the expert could apply general principles to the case of the bumblebee. Conceivably, even if he had never seen a bumblebee, he still would be qualified to testify, as long as he was familiar with its component parts.
>
> On the other hand, if one wanted to prove that bumblebees always take off into the wind, a beekeeper with no scientific training at all would be an acceptable expert witness *if* a proper foundation were laid for his conclusions. The foundation would not relate to his formal training, but to his firsthand observations. In other words, the beekeeper does not know any more about flight principles than the jurors, but he has seen a lot more bumblebees than they have.

*Rose*, 388 F. App'x at 533 (quoting *Berry v. City of Detroit*, 25 F.3d 1342, 1349-50 (6th Cir. 1994)). Notably, "the issue with regard to expert testimony is not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question." *See Berry*, 25 F.3d at 1351.

B. Reliability of the Proposed Testimony

Rule 702 guides the trial court by providing general standards to assess reliability: whether the testimony is based upon "sufficient facts or data"; whether the testimony is the "product of reliable principles and methods"; and whether the expert "has applied the principles and methods reliably to the facts of the case." *See* Fed. R. Evid. 702; *In re Scrap Metal Antitrust Litigation*, 527 F.3d at 529. The Supreme Court's holding in *Daubert* offered a non-exclusive list of factors for courts to consult in evaluating reliability: testing, peer review, publication, error rate, standards controlling the technique's operation, and general acceptance in the relevant scientific community. *See Daubert*, 113 S. Ct. at 2796-98. The *Daubert* factors should be applied

flexibly and tailored to the facts of a particular case. *See Kumho,* 119 S. Ct. at 1175 (citing *Daubert,* 113 S. Ct. at 2796). The Sixth Circuit has held that the *Daubert* factors "are not dispositive in every case" and should be applied only "where they are reasonable measures of the reliability of expert testimony." *See In re Scrap Metal Antitrust Litigation*, 527 F.3d at 529 (quoting *Gross v. Comm'r,* 272 F.3d 333, 339 (6th Cir. 2001)). Where a party proffers non-scientific expert testimony, the trial court may look to the *Daubert* factors or, as apt, "'the relevant reliability concerns may focus upon personal knowledge or experience.'" *See Surles ex rel. Johnson v. Greyhound Lines, Inc.*, 474 F.3d 288, 295 (6th Cir. 2007) (quoting *First Tennessee Bank National Ass'n v. Barreto*, 268 F.3d 319, 335 (6th Cir. 2001)).

C. Relevance of the Proposed Testimony

Finally, the trial court must determine whether the expert's reasoning or methodology can properly be applied to the facts at issue – that is, whether the opinion is relevant. *See Daubert,* 113 S. Ct. at 2795-96. Relevant testimony "assist[s] the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. The relevancy requirement provides for a "fit" between the testimony and the issue or issues to be resolved. *See In re Heparin Products Liability Litigation*, No. 1:08-HC-60000, 2011 WL 2971918, at *7 (N.D. Ohio Jul. 21, 2011) (slip copy) (citing *United States v. Bonds,* 12 F.3d 540, 555 (6th Cir. 1993)). The Supreme Court illustrated this "fit" requirement as follows:

> The study of the phases of the moon, for example, may provide valid scientific "knowledge" about whether a certain night was dark, and if darkness is a fact in issue, the knowledge will assist the trier of fact. However (absent creditable grounds supporting such a link), evidence that the moon was full on a certain night will not assist the trier of fact in determining whether an individual was unusually likely to have behaved irrationally on that night.

*See Daubert*, 113 S. Ct. at 2796.

\* \* \*

Here, Plaintiff must prove by a preponderance that the admissibility requisites exist as to the proposed testimony of Troy Cottles. Importantly, while Cooper Tire levels many critiques at Cottles, Cooper does not fight Cottles with competing proof, *e.g.*, the counter-position of a qualified opposing expert. Rather, Defendant points out alleged self-evident flaws, deficiencies, and failings either in Cottles's background, his methods, or his particular opinions.[1] The only *evidence*, however, really comes from the presentation of Plaintiff, largely via Cottles himself, in the form of his signed report, *see* DE #221-3 (Cottles Report); his deposition, *see* DE #187-4 (Cottles Deposition); and his affidavit, *see* DE #234-1 (Cottles Affidavit).[2]

## II. Rule 702 Application

*a.     Cottles is qualified.*

The witness proposes to testify about various design and/or manufacturing defects that allegedly contributed collectively to tire weakness and, ultimately, tread/belt separation in this case. Cottles has seventeen years of direct and relevant experience in the tire and rubber industry. That career peaked and ended with Cottles as Technical Director of tire development for Goodyear-Dunlop. He earned education as a mathematician with a physics minor. His years

---

[1] Much of the criticism simply goes to weight and credibility. Cottles undoubtedly has the view that only the alleged defects led to the accident. Cooper Tire chides Cottles for not assigning any blame to other factors, such as tire misuse or possible other accident influences. Cottles did assess other causes, and Cooper Tire can take issue with that as appropriate on cross-examination.

[2] Plaintiff properly tendered an affidavit to oppose the motion to exclude. Defending a *Daubert* motion may call for information (*e.g.*, explanation of methods/processes, enumerating specific Rule 702 factors) that may not necessarily be part of a Rule 26 expert disclosure proper. The tender was appropriate as a response to the motion.

in the industry included periods in and responsibility for tire design drawings and tire design; warranty assessment (including review of "field returns"); OEM technical tire development for all Dunlop North American tires; design programs for supply to Mercedes, Toyota, Nissan, and Honda; formulation of "countermeasures for any in-service product concerns"; product integrity testing, including endurance testing; and technical support on product liability issues, including review of "claim tires." *See* DE #234-1 at 9-11 (Resume); DE #234-1 (Affidavit) at ¶¶ 1-6. He has reviewed "hundreds of tires with belt to belt adhesion failures." *See* DE #234-1 (Affidavit) at ¶ 1. Through his years in the industry, Cottles trained and had experience in "all aspects of tire design and failure analysis." *See id.* at ¶ 3. Per Cottles, Dunlop tasked him with and considered him qualified to "perform forensic analyses of what caused tires to fail[.]" *See id.* at ¶ 4. Cottles specifically averred that his role in this case replicated his duties at Dunlop: "There is nothing I have done in this case which I did not do in a professional capacity for Dunlop [other than testimony.]" *See id.*

      The witness has qualified repeatedly to testify about tire failure in cases throughout the nation. Though not dispositive, other courts' treatment of Cottles solidifies this Court's qualification conclusions. *See, e.g., Stallings v. Michelin Amers. Res. & Dev. Corp.*, No. 1:07-CV-2497-RWS, 2010 WL 966865, at *2 (N.D. Ga. Mar. 12, 2010) (unreported) ("The Court finds that Mr. Cottles has extensive experience in examining tires and also in designing tires to meet various safety, performance, and cost requirements . . . and is therefore qualified to testify[.]"); DE #221-18 (unreported opinion in *Ramirez v. Michelin N. Am., Inc.*, No. SA-07-CA-1032-OG (W.D. Tex. Feb. 18, 2010)) at 4 ("Cottles' extensive and impressive qualifications are set out in his affidavit."); *Whitten v. Michelin Amers. Res. & Dev. Corp.*, No. 05-2761-

JPM/TMP, 2008 WL 2943391, at *3 n.3 (W.D. Tenn. Jul. 25, 2008) (unreported) (citing approvingly to Cottles' affidavit in that case: "He has testified at numerous trials in both state and federal courts on tire failure analysis and tire design and manufacturing. His opinions have never been excluded by any court of law.").

The Court finds that Plaintiff has proven that Cottles's experience in the tire industry, premised on specific roles that directly encompass the subject matter here addressed, qualifies the witness under Rule 702 to offer testimony in this case about the tire involved.

 b.    *Cottles's opinions are both relevant and reliable.*

This case centers on an accident involving an alleged tire failure. Plaintiff contends the tread/belt separation on the subject tire caused the accident. Plaintiff further contends the tire failed because it was defective. The reason for separation composes part of the case's core, and testimony from Cottles will directly assist with respect to the jury's assessment of the tire involved and the events in question.

Cottles essentially testifies that the tire had approximately eight design and/or manufacturing defects that caused or contributed to tread separation. *See* DE #187-4 at 209-10;[3] DE #221-3 at 41-49. He identifies the claimed defects and explains the manner by which each separate defect either initiated weakness into the stability or adherence of the tire rubber or failed to mitigate against heat and stress vulnerability in the tire. *See id.* One defect did not alone lead to the failure. Rather, the combination of defects undercut the "robustness" of the tire leading it to fail before the end of the tire's useful tread and thus useful economic life. Per Cottles, the tire

---

[3] To assist readers, the Court cites to the specific deposition transcript page, rather than the four-panel exhibit page.

was defective generally because it was subject to separation before the tread fully exhausted and ended the tire's eligibility for road use. *See, e.g.,* DE #187-4 at 261 (describing scenario where tires "did not incorporate enough adequate robustness of design to sustain themselves through a normal life cycle"); *id.* at 209 ("[Y]ou can make the design robust enough to overcome, for a longer duration, the effects of some of the manufacturing defects . . . [.]"); DE #234-1 at ¶ 20 ("[T]he cause of the failure often will not be a single item but rather can be a list of items that worked together to form a tire that was overly prone to failure.").

Cooper Tire woodenly criticizes Cottles under the *Daubert* scientific evidence rubric. While the scrutiny of non-scientific expertise is just as rigorous, the notion that an experientially qualified tire inspector must be published and peer reviewed or have access to particularized rate of error data ignores the flexibility built into Rule 702. That rule requires, as a precondition to admissibility, that a qualified expert's methods and application be trustworthy and rest on good grounds. The manner of scrutiny depends on the type of expert. *See* Fed. R. Evid. 702 advisory committee's note (2000) ("The trial judge in all cases of proffered expert testimony must find that it is properly grounded, well-reasoned, and not speculative before it can be admitted."). Here, Cottles relies on much more than *ipse dixit* as a basis for the opinions cited.

Because Plaintiff has established Cottles to be an expert qualified by experience and training, the Court looks to whether Plaintiff has shown "how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *See id.* Here, Cottles reached a pinnacle tire-design, tire-analysis position for a major American manfuacturer. His seventeen-year career featured advancement to the point of nationwide design and technical responsibilities with the company.

Thus, Cottles does not simply declare himself qualified to study and design around tire failure; the industry deemed him qualified by the responsibilities and positions granted in the competitive marketplace and real business world.

The Court also notes that Cottles's examination method, detailed, *e.g.*, at DE #234-1 at ¶¶ 7-14, tracks the method he employed as a Dunlop high-level employee. He further avers that the method parallels those in the industry and those employed by tire failure experts generally. The Court sees significant overlap between the inspection methods of Cooper expert Grant and those of Cottles. Grant, it seems, reaches opinions about the *absence* of any defect largely from a physical review of the subject tire. This, at the least, is the method or schema Cottles also used. The NHTSA report, cited by Cottles, also demonstrates corroborative elements, to include reliance on shearography and tire-cutting. Again, other courts have drawn the same conclusions. *See, e.g., Stallings*, 2010 WL 966865, at *3 (endorsing method of Cottles, noting similarity of Grant method, and noting NHTSA parallels). Surely the career path, accepted method, and outside corroboration significantly support Cottles's protocols and the relationship between his experience and the conclusions reached.

Each sub-opinion offered further rests on objective observations about the physical characteristics of or design elements in the particular tire. Each such opinion finds methodological validation through other sources, some even from Cooper itself. For instance, Cooper's own documents repeatedly support the positive effect of belt-edge gum strips in reducing belt-edge separations. Further, Cottles could cite to multiple patents, his own testing, and industry resources endorsing or reflecting use of nylon cap plies to reduce separation risk. These bases of support validate the opinions Cottles offers. Cottles himself tested and designed

related to the tread-belt width ratio,[4] and he cited to Cooper and other industry studies correlating belt-width to excess temperature "that isn't good for the tire." *See* DE #187-4 at 243. Heat and its fatiguing effects are a basic part of Cottles's opinions, *see* DE #221-3 at 43-44, substantiated in part by reference to Cooper's own work.

The outside references and Report sources cited by Cottles with respect to the properties of rubber, the effect/sources of oxidation, the role of heat and stress (and exacerbation through defects such as belt spacing irregularity or abnormality) corroborate the experience-based observations Cottles makes. He has seen, assessed, and designed to account for such problems at the highest levels.[5] He reviewed in detail the physical characteristics of the subject tire and drew conclusions based on what he observed, viewed through the lens of a career spent studying and understanding tire performance, failure, and design reliant on the same methods here pursued. *See Whitten*, 2008 WL 2943391, at *4 (accepting Cottles's "larger theory" of tire defect "involving fourteen separate flaws that contribute as a whole to the defectiveness of the tire's design" and permitting testimony because of Cottles's "previous employment with Goodyear-Dunlop, general practice within the tire industry, and a combination of fourteen design flaws").

The offered opinions are in dispute here, but that does not make them inadmissible where

---

[4] Cottles did explain the *general* parameters of the test but could not provide details, in part because of confidentiality concerns with respect to prior employment. As a trial limitation, it would be unfair for Cottles to discuss **any testing** before the jury that he could not discuss in detail pre-trial.

[5] Thus, he is not a chemist but has experience in knowing what AO materials are available and how those materials can perform in a tire. He observes failures and "reversion" in the skim stock of an active-use tire and draws the conclusion that the stock must be defective. This is a position subject to challenge, but it is not speculative or methodologically unreliable **because** of Cottles's experience. The same analysis supports the other manufacturing defect observations.

10

Cottles and Plaintiff have proven by a *preponderance* the predicates under Rule 702. The superior weight of evidence on the issue of admissibility favors the Plaintiff, and Cottles should be permitted to testify.

*c.     The Lee report is a special category.*

The Court does depart concerning Cottles's use of and reliance on the Lee report. In a separate order entered herewith, the Court bars use of that report because Cottles had the report since October 2010 and did not disclose the content of the report until March of 2011. On that basis, the Court would not permit use of Lee's report.

Alternatively, however, other problems surround Cottles's reliance on Lee's numbers. The report generates tolerance and related figures supporting design criticisms by Cottles. However, Lee's report does not explain any of the methodology, reliability, or technical aspects of the program producing the figures and charts. Cottles did not do the work and he expresses little familiarity with exactly what Lee did. *See* DE #187-4 at 318-19. Lee is not an expert in the case. Plaintiff declares an intent to call Lee, but Plaintiff apparently has not disclosed Lee as a testifying expert.[6]

Cottles tries to characterize Lee's program as being one well-accepted in the industry. *See id.* at 242. That may or may not be true, but the program identification is not even in the Lee report. Further, Cottles's lack of connection to the report substance undercuts any valid reliance by him on the report *tout court*. The Court finds that even without the tardiness of disclosure,

---

[6] Plaintiff protests that Lee is no expert – "Don Lee is not an expert witness and does not provide any expert opinions in this case." *See* DE #221 at 9. Yet, the Lee report concludes with a paragraph – the only textual paragraph in the report – describing the "opinions expressed" as given "to a reasonable degree of engineering and scientific probability." *See* DE #187-5 at 18.

11

Cottles should not be permitted to utilize the report of an undesignated expert in this case. *See Peterson v. Daimler Chrysler Corp.*, No. 1:06-CV-108-TC, 2011 WL 2491026, at *2-*5 (D. Utah Jun. 22, 2011) (slip copy) (finding Cottles qualified "as a tire failure expert" but prohibiting reliance on an FEM analysis by Lee in a comparable scenario: "Because Mr. Cottles lacks knowledge, skill, experience, training, and education in FEM analysis, the court find that Mr. Cottles is not qualified as an expert . . . to testify about the FEM report."). The same characteristics here demand the same result.

\* \* \*

For the reasons stated, the Court **DENIES** the motion to exclude Cottles. The only exception relates to use of the Lee report, as further discussed in the body of this Order.

Any party objecting to this Order should consult the statute and Federal Rule of Civil Procedure 72 concerning its right of and the mechanics for reconsideration before the District Court. Parties may debate whether this decision stands as dispositive or non-dispositive. *See Pride v. BIC Corp.*, 54 F. Supp. 2d 757, 758-59 (E.D. Tenn. 1998); *Coppedge v. K.B.I., Inc.*, No. 9:05-CV-162, 2007 WL 397495, at *1 n.1 (E.D. Tex. Feb. 1, 2007) (unreported). The parties **SHALL** address the timing and standard of review for any objection, under Rule 72, at the scheduled pretrial unless otherwise advised by an order of Judge Forester.

This the 11th day of August, 2011.

Signed By:
Robert E. Wier /s/ REW
United States Magistrate Judge